FILED

OCT 3 2013

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | ) BAP No. NC-12-1635-DPaJu |
| | ) |
| JOSEPH P. KEITH and CAROLYN G. KEITH, | ) Bk. No.  11-12535-AJ |
| | ) |
| | ) Adv. Proc. No. 11-01248-AJ |
| Debtors. | ) |
| | ) |
| JOSEPH P. KEITH; CAROLYN G. KEITH, | ) |
| | ) |
| Appellants, | ) |
| | ) |
| v. | ) **M E M O R A N D U M**[1] |
| | ) |
| EXCHANGE BANK, | ) |
| | ) |
| Appellee. | ) |

Argued and Submitted on September 20, 2013
at San Francisco, California

Filed - October 3, 2013

Appeal from the United States Bankruptcy Court
for the Northern District of California

Honorable Alan Jaroslovsky, Bankruptcy Judge, Presiding

Appearances:    Douglas Provencher of Provencher & Flatt LLP argued for appellants Joseph P. Keith and Carolyn G. Keith; Lewis R. Warren of Abbey, Weitzenberger, Warren & Emery argued for appellee Exchange Bank.

Before:  DUNN, PAPPAS and JURY, Bankruptcy Judges.

---

[1]    This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

1

The complaint in the subject adversary proceeding asserted that Exchange Bank's claims against Joseph P. and Carolyn G. Keith were based on Exchange Bank's forbearance in pursuing a writ of attachment against the Keiths because Exchange Bank had relied on a materially false financial statement submitted by the Keiths. Further, Exchange Bank had clarified in pretrial proceedings that it was asserting a claim only pursuant to § 523(a)(2)(B).[2]

In its Pretrial Brief, Exchange Bank added a claim for relief for actual fraud pursuant to § 523(a)(2)(A). The Keiths objected to the introduction of evidence at trial which might support the late-added claim for relief.

Following the trial, the bankruptcy court determined that Exchange Bank had not met its burden of proving damages under either of its alternative theories. Nevertheless, the bankruptcy court granted judgment to Exchange Bank, pursuant to § 523(a)(6), finding that the debt the Keiths owed to Exchange Bank was one for willful and malicious injury by the Keiths to Exchange Bank.

We REVERSE.

## I.  FACTS

A.  Default and Failed Workout.

Mr. Keith is a real property developer in the Santa Rosa, California area. As relevant to this appeal, Mr. Keith did business

---

[2]  Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as Civil Rules.

2

through Cobblestone Homes, Inc. ("Cobblestone"), of which he was the principal. Mr. Keith also conducted business for more than twenty years with a long-time friend, Russell Flynn. Cobblestone as borrower, and Mr. Keith as guarantor, had a long-standing financing arrangement with Exchange Bank.[3]

When the real estate market collapsed, Mr. Keith and Cobblestone were unable to meet their obligations to Exchange Bank. On March 28, 2007, Exchange Bank commenced a formal workout of its relationship with Mr. Keith. From the perspective of Exchange Bank, Mr. Keith was "slow to initiate the necessary steps to implement a workout plan," but he soon became "fully engaged."

As a part of the workout process, a series of forbearance agreements were executed extending all loan maturities first to December 31, 2007, then to June 30, 2008, and finally, to December 31, 2008. As required by the forbearance agreements, the Keiths provided periodic personal financial statements to Exchange Bank.

From Exchange Bank's view, by July 2008, considerable progress had been made in the workout arrangement. At that time, in an internal memorandum, an Exchange Bank officer made the following comments regarding Mr. Keith's actions implementing the workout:

> The specific accomplishments to date are accompanied by a generally high level of cooperation, a willingness to work collaboratively to find solutions to problems with the various projects, and a very strong commitment to the

---

[3] The Cobblestone/Exchange Bank financing relationship had been ongoing since the late 1980s. Mr. Keith guaranteed all Cobblestone debt to Exchange Bank.

3

survival of [Cobblestone]. Further, having worked through an initial period of shock, [Mr. Keith] is doing what is needed to honor the obligation of his guaranty to [Exchange Bank].

Mr. Keith had facilitated the sale of numerous Cobblestone and affiliate-owned land parcels, which contributed $26.811 million to pay down Exchange Bank debt. Mr. Keith also had sold real property he held individually and in partnership with Mr. Flynn, as well as other assets, collecting $6.239 million to fund Cobblestone operations. Additionally, beginning in April 2007, Mr. Keith significantly reduced Cobblestone's costs, mostly by reducing staff from thirty-four, first to twenty, and ultimately to thirteen.

Until December 2008, Mr. Keith kept all loans with Exchange Bank current by selling partnership interests in income-producing properties. During this period, Mr. Keith contributed more than $8 million to Cobblestone to maintain current interest payments on Exchange Bank loans and to pay Cobblestone's overhead. In December 2008, Mr. Keith informed Exchange Bank he could not continue the interest payments due pursuant to the forbearance agreements.

Thereafter, Exchange Bank determined that its primary course of action for collection of the Cobblestone debt would be to liquidate the real property which collateralized its loans. As of March 4, 2009, Exchange Bank was owed $44,626,313.09, and the "as is" appraised value of the collateral totaled $45,132,750. Exchange Bank projected that liquidation of the collateral would likely realize between 78 and 90 percent of this value.

Exchange Bank offered to release the Keiths fully from their

4

guaranties upon their payment of $7.5 million ("Release Payment"), conditioned upon Mr. Keith's cooperation in the liquidation of the real property. In setting the amount of the Release Payment, Exchange Bank used the Keiths' January 20, 2009 financial statement, which reflected liquid assets of approximately $500,000 and additional assets in the approximate amount of $18.3 million. The financial statement also reflected liabilities in the approximate amount of $10.2 million, such that the stated net worth of the Keiths was $8,698,752. Exchange Bank imposed a very short deadline for the Release Payment, with one-half due by March 16, 2009 and the balance by June 30, 2009. The Release Payment was not made.

After Exchange Bank had liquidated its real property collateral, it initiated, on November 10, 2009, litigation against the Keiths in the Sonoma County (California) Superior Court ("State Court") to enforce the guaranties. On April 22, 2011, the State Court granted Exchange Bank's motion for summary judgment. On July 1, 2011, before judgment was entered against them in the State Court, the Keiths filed a chapter 11 bankruptcy petition, at which time their unsecured debt to Exchange Bank was approximately $21 million.

B.   The Adversary Proceeding.

It is in the context of the failed workout that the primary dispute in this appeal arose. On June 9, 2008, the Keiths received a $2.6 million federal tax refund. Notwithstanding the ongoing workout with Exchange Bank, the receipt of this payment never was disclosed, including in the personal financial statement the Keiths

5

provided Exchange Bank almost immediately thereafter on June 18, 2008. On August 19, 2008, Mr. Keith transferred $500,000 ("Transfer") from the tax refund to Mr. Flynn with a request that Mr. Flynn "hold" the funds for Mr. Keith.[4] At some point not apparent in the record, Exchange Bank became aware of the Transfer.

Within the deadline set forth in Rule 4007, Exchange Bank filed an adversary proceeding seeking a determination that its debt was nondischargeable to the extent of the Transfer.[5] The complaint ("Complaint") did not refer to a code section under which Exchange Bank was making its claim; the adversary proceeding cover sheet indicated the claim was based on "§ 523(a)(2), false pretenses, false representation, actual fraud."

Exchange Bank's theory, as set forth in the complaint, is as follows: The Keiths failed to include the tax refund in the June 18, 2008 financial statement they provided to Exchange Bank; they thereafter failed to include the Transfer in the January 20, 2009 and June 15, 2009 financial statements they provided to Exchange Bank; they failed to include in the November 18, 2009 financial statement they provided to Exchange Bank after the State Court

---

[4] Subsequently, on August 28, 2008, the Keiths executed a promissory note in favor of Mr. Flynn, and Mr. Flynn and the Keiths entered into a line of credit loan agreement pursuant to which Mr. Flynn agreed to loan to the Keiths up to a maximum of $5 million, pledging various items of collateral to secure the line of credit.

[5] Prior to the Trial, the Keiths obtained confirmation of a plan of reorganization which preserved the rights of Exchange Bank to bring the adversary proceeding.

litigation was filed, the $450,000 balance of the Transfer remaining after $50,000 was "returned" to them by Mr. Flynn on October 16, 2009; and they thereafter failed to disclose to Exchange Bank that Mr. Flynn had "returned" to them $50,000 on March 11, 2010, $50,000 on May 19, 2010, $50,000 on December 9, 2010, $50,000 on December 27, 2010, $50,000 on January 19, 2011, $80,000 on January 28, 2011, and $100,000 on March 7, 2011. In submitting each of the financial statements identified in the Complaint, the Keiths intended to deceive Exchange Bank regarding the true nature and scope of their assets. Because the Keiths withheld information about the Transfer from Exchange Bank, Exchange Bank was deprived of its ability to obtain a writ of attachment in the State Court litigation which would have allowed Exchange Bank to recover the Transfer and apply the funds it represented in satisfaction of the Keiths' debt to Exchange Bank.

The Keiths moved to dismiss the Complaint primarily because they did not know on which code section Exchange Bank was relying in asserting its complaint. Because the allegations related to financial statements the Keiths provided during the workout and after the State Court action was filed, they "guessed" that Exchange Bank might be relying on § 523(a)(2)(B). In opposing the motion to dismiss, Exchange Bank stated it was in fact relying on § 523(a)(2)(B). The Keiths thereafter withdrew the motion to dismiss and filed an answer to the Complaint.

The bankruptcy court held a scheduling hearing on February 27, 2012, at which time it set trial ("Trial") of the dispute for

7

November 15, 2012.[6]

The witnesses at the trial included Mr. and Mrs. Keith, two Exchange Bank employees, and Mr. Flynn.

The essence of the testimony of the Exchange Bank employees was that had they known of the Transfer, they would have, as a matter of policy, taken steps to initiate a writ of attachment to preserve the funds for the benefit of Exchange Bank. However, the record reflects that Exchange Bank was aware from the Keiths' June 15, 2009 financial statement that the Keiths had $1,000,000 in a certificate of deposit. Yet, Exchange Bank took no action to obtain a writ of attachment at that time.

The essence of the testimony of Mrs. Keith is that she allowed others to sign documents without requiring that she be informed of the nature and contents of the documents or any representations they might have included.

The essence of Mr. Keith's testimony is that he made the Transfer because he owed Mr. Flynn money. He denied he had an actual intent to put the funds represented by the Transfer beyond the reach of Exchange Bank while still maintaining his right to them. Exchange Bank effectively impeached Mr. Keith's trial testimony by his prior deposition testimony.

QUESTION: What was the purpose of paying Russell Flynn that $500,000 that is reflected in this check?

---

[6] No transcript is in the record for the February 27 hearing. The bankruptcy court's scheduling order following the February 27 hearing only set forth basic deadlines for discovery and submission of pretrial materials.

8

ANSWER: Those were moneys that I sent to Russ for him to hold for me.

Trial Tr. at 22:11-14.

QUESTION: Please tell me what you mean by the words for him to hold for you?

ANSWER: What I meant by that is for him to hold, as informal trust wherein he would release funds to me as I requested.

Trial Tr. at 23:20-24.

QUESTION: Do you specifically recall having a conversation with Mr. Flynn about the transmission of this particular check to him?

ANSWER: I do recall having a conversation with him.

QUESTION: What did you say and what did he say in the course of that conversation, which you specifically recall?

ANSWER: I said that I am sending a check to you for you to hold for me and release it as I request.

Trial Tr. at 24:21-25:3.

QUESTION: Why could you not hold that check in your own account?

ANSWER: There was at the time the feeling on my part that banks would attach property of mine.

Trial Tr. at 25:11-14.

QUESTION: Isn't it true that you asked him . . . to hold it as opposed to holding it on you own, because at that time you had a fear that banks would attach your bank accounts?

ANSWER: Well, I did have fears that Exchange Bank would attach assets of mine, because they told me they would.

QUESTION: So your answer to the question is yes?

ANSWER: Well, the answer to the question is I had a fear

9

> that the banks - I took Tony Ghisla [an Exchange Bank employee] at his word that he will attach my accounts. And he will, and he will attach property. He'll do whatever he can. So I did have that concern.

Trial Tr. at 26:22-27:8.

Additionally, Exchange Bank introduced in evidence a document Mr. Keith admitted preparing. That document contained a list of checks Mr. Keith paid to Mr. Flynn and of checks Mr. Keith received from Mr. Flynn. Included under the category "Keith Checks to Russ Flynn" is the check representing the Transfer; the document states that the purpose of the check was "Hold." Included under the category "Checks Received from Russ Flynn" are eight checks totaling $480,000, received between October 16, 2009 and March 7, 2011. The stated purposes of each of these checks was "Return of funds held."

The essence of Mr. Flynn's testimony was that he deposited the Transfer into his regular account, commingling it with other funds. He testified that Mr. Keith's request that he "hold" the funds for Mr. Keith only meant that Mr. Keith, who had borrowed funds in the past, might need to borrow funds in the future. Exchange Bank attempted to impeach the Trial testimony of Mr. Flynn with his testimony at a prior deposition. In the deposition, Mr. Flynn had explained the interrelationship between debts owed to him by Cobblestone and by Mr. Keith, which apparently at one time were combined. Out of concern as to what might happen should Cobblestone seek bankruptcy protection, Mr. Flynn segregated the Cobblestone debt from that owed by Mr. Keith. The $750,000 balance previously owed by Mr. Keith had been paid. Once the accounts were segregated

10

it was clear to Mr. Flynn that the $500,000 represented by the Transfer actually belonged to Mr. Keith. When asked why he did not just send the $500,000 to Mr. Keith upon realizing he had, in effect, overpaid, Mr. Flynn responded "He didn't ask for it." Trial Tr. at 95:1-96:8.

The trial brief filed by Exchange Bank addressed claims for relief pursuant to both § 523(a)(2)(A) and (B).[7] In its opening statement, Exchange Bank's counsel emphasized that it was proceeding on two legal theories:

> Your Honor, Exchange Bank is proceeding under two separate and independent theories for a finding that $500,000 should be nondischargeable under Sections [sic] 523, the first one being (2)(A) that is for money obtained by actual fraud and 523(a)(2)(B) that relates to the bank's forbearance on collection of a debt to the extent caused by a materially false financial statement.

Tr. of Trial at 3:19-25.

During the questioning of Mr. Keith by Exchange Bank, the Keiths' counsel objected to questions to the extent they exceeded the scope of the Complaint and the § 523(a)(2)(B) claim. In defending against an objection to relevance of questions relating to what Mr. Keith did with various funds he received from Mr. Flynn, counsel for Exchange Bank articulated Exchange Bank's § 523(a)(2)(A) theory as follows:

> The second part of the legal analysis and a totally separate and independent theory is to the extent [the Transfer] constituted a fraudulent transfer it is a debt. And to the extent it is a debt which was willfully transferred fraudulently while Mr. Keith owes $40 million to Exchange Bank that constitutes fraud on a creditor as

---

[7] The Keiths filed no trial brief.

11

provided in the statute [§ 523(a)(2)(A)].

Tr. of Trial at 46:9-15.

The following colloquy thereafter took place between counsel for the Keiths and the bankruptcy court regarding whether Exchange Bank's questions to Mr. Keith were beyond the scope of the issues framed by the Complaint.

MR. PROVENCHER:  Well, Your Honor, I'm also -- Your Honor, I want to object.  Of course, this innovative fraudulent transfer theory –

. . .

MR. PROVENCHER: Well, I'm objecting to this whole line. This theory is nowhere in the complaint.  So in the trial brief they came up and said, well, we're suing for false financial statement and we're suing for actual fraud.  The complaint just talks about forbearance on a false financial statement.  There's nothing in there about fraud.  So I don't even think it meets the requirements of alleging the fact.

THE COURT: I think you are probably correct.  But I will allow counsel, just that in the off chance that when I get back into chambers and review the case law, I suddenly see, oh, my goodness.  There's a case that I wasn't thinking about.  I don't think that's going to happen, but it might.  So I'll allow just a very few questions, because I am pretty sure that the line of questioning is irrelevant.  And that is without even considering whether or not the complaint fairly encompasses the theory.

Trial Tr. at 51:17-52:12.

In its closing argument, Exchange Bank continued to emphasize its assertion that it was the submission of the false financial statements that created the basis for nondischargeability of debt in the amount of the funds represented by the Transfer, either in its full amount or in the amount remaining at the time the State Court litigation was filed, $450,000.  Specifically, the conduct of the

Keiths prevented Exchange Bank from exercising its right to seek a writ of attachment in the State Court litigation because neither the funds represented by the Transfer, nor the "return" of funds to Mr. Keith, ever appeared on any financial statements the Keiths provided to Exchange Bank.

C.  The Decision.

Following the trial, the bankruptcy court took the matter under submission.  The bankruptcy court's decision is contained in its Memorandum After Trial ("Decision").  In the Decision, the bankruptcy court characterized Mr. Keith's arrangement with Mr. Flynn as "very foolish," pointing out that under other circumstances, i.e., had the timing been different, the Transfer might have been avoidable and the Keiths might have lost their discharge.

However, the bankruptcy court ruled against Exchange Bank both on the § 523(a)(2)(A) and § 523(a)(2)(B) claims for relief.

With respect to the § 523(a)(2)(B) claim, the bankruptcy court determined that Exchange Bank had not met its burden of proof with respect to the element of reliance.

> The evidence before the court is that [Exchange Bank] was waiting to file suit [against the Keiths] until its secured remedies were exhausted.  No bank officer testified that it would have filed sooner if it had known about the transfer to Flynn, nor does the court draw that inference from general testimony that the Bank is always aggressive in seeking attachment.

Decision, at p. 3 n.1.  Neither did Exchange Bank meet its burden of proof on the element of damages: "In fact, under California law, an attachment cannot be issued on behalf of a creditor holding real

13

estate as security. 16A Cal.Jur.3d, Creditors' Rights and Remedies § 79. The Bank did not show that it was unsecured in January of 2009." Decision, at p. 3 n.1.

With respect to the § 523(a)(2)(A) claim, the bankruptcy court similarly determined that Exchange Bank had not met its burden of proof on the issue of damages. Because Mr. Flynn had commingled the funds represented by the Transfer with other funds, at most the Keiths had an expressed willingness from Mr. Flynn to make future loans to them. The bankruptcy court ruled that a "willingness" is a contingent or uncertain obligation and as such was not attachable under California law, citing <u>Javorek v. Super. Ct.</u>, 17 Cal.3d 629, 643 (1976). <u>Id.</u> at 4:5-10.

After chiding Exchange Bank for making its work more difficult, the bankruptcy court stated, "I have found another way," and thereafter determined that what Exchange Bank should have asserted was a claim for relief under § 523(a)(6), and under the facts, it was entitled to judgment against not just Mr. Keith, but Mrs. Keith as well, on that theory.

> When a debtor makes a fraudulent transfer with the intent to harm a specific creditor, that creditor has a nondischargeable claim under § 523(a)(6) for its damages. <u>In re Bammer</u>, 131 F.3d 788 (9th Cir. 1997). See also <u>In re Jennings</u>, 670 F.3d 1329, 1334 (11th Cir. 2012). It is the transfer itself, not the subsequent failure to list the transferred funds as an asset in the financial statement, that created the nondischargeable debt.

<u>Id.</u> at 5:5-9. The bankruptcy court found that the Transfer was "wrongful, intentional, and necessarily harmed the Bank by reducing the assets it could reach," pointing out that if Mr. Keith had not

14

made the Transfer he would have had $450,000 which the Bank could have attached when it filed the State Court litigation. Finally, the bankruptcy court found there was no just cause for Mr. Keith's actions because he could have legitimately made a loan payment to Mr. Flynn rather than "creating a slush fund."

The Keiths timely appealed the judgment.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158

## III. ISSUE[8]

Whether the bankruptcy court erred in entering a nondischargeable judgment in favor of Exchange Bank pursuant to § 523(a)(6), a claim for relief not asserted by Exchange Bank in its pleadings.

## IV. STANDARDS OF REVIEW

In the context of an appeal from a judgment determining a debt to be nondischargeable, the issues often present mixed questions of law and fact. Murray v. Bammer (In re Bammer), 131 F.3d 788, 792 (9th Cir. 1997). Such issues are reviewed "de novo because they require consideration of legal concepts and the exercise of judgment about the values that animate legal principles." Id. Similarly, whether adequate due process notice was given in any particular

---

[8] Exchange Bank has not appealed the bankruptcy court's denial of relief pursuant to §§ 523(a)(2)(A) and (B); our review of this dispute therefore is limited to the propriety of the bankruptcy court entering judgment in favor of Exchange Bank pursuant to § 523(a)(6).

15

instance is a mixed question of law and fact that we review de novo. Educ. Credit Mgmt. Corp. v. Repp (In re Repp), 307 B.R. 144, 148 (9th Cir. BAP 2004) (citations omitted).  De novo review requires that we consider a matter afresh, as if no decision had been rendered previously.  United States v. Silverman, 861 F.2d 571, 576 (9th Cir. 1988); B-Real, LLC v. Chaussee (In re Chaussee), 399 B.R. 225, 229 (9th Cir. BAP 2008).

V.  DISCUSSION

Civil Rule 8(a) sets out the requirements for pleading a claim for relief:

> **Claim for Relief.**  A pleading that states a claim for relief must contain:
> (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;
> (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and
> (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

Of relevance in this appeal is the provision which required Exchange Bank to include in the Complaint a short and plain statement of its claim showing that it was entitled to relief.

> Under the liberal system of notice pleading set up by the Federal Rules, [Civil] Rule 8(a)(2) does not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

Lee v. City of Los Angeles, 250 F.3d 668, 679 (9th Cir. 2001) (alterations and quotations omitted).

It is undisputed by the parties, and acknowledged by the

16

bankruptcy court in its expression of frustration with Exchange Bank, that Exchange Bank did not plead a claim for relief pursuant to § 523(a)(6).

Exchange Bank relies on Civil Rule 15(b)(2) as the authority upon which the bankruptcy court nevertheless could enter judgment on its behalf, notwithstanding its failure to plead a claim for relief pursuant to § 523(a)(6). Civil Rule 15(b)(2), applicable in the adversary proceeding pursuant to Rule 7015, provides:

> When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move-at any time, even after judgment-to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

The problem for Exchange Bank is that the record does not establish that an issue not raised in the pleadings was tried with the express or implied consent of the Keiths. To the contrary, at Trial, counsel for the Keiths opposed Exchange Bank's efforts to introduce evidence on § 523(a)(2)(A) issues, including Exchange Bank's theory that the alleged fraud derived from a fraudulent transfer, on the basis that the claim was not included in the Complaint, reflecting the Keiths' vigilance in ensuring that the scope of the proceeding was limited to the claim pled. Accordingly, Civil Rule 15(b)(2) does not provide a basis for us to affirm the judgment of the bankruptcy court on a legal theory not included in the pleadings.[9] More important, as cited to us by Exchange Bank,

---

[9] Nor does it provide a basis for us to vacate the judgment
(continued...)

17

the Ninth Circuit long ago clarified that Civil Rule 15(b) relates to <u>factual</u> issues, not legal theories or claims. <u>Dering v. Williams</u>, 378 F.2d 417, 419 (9th Cir. 1967).

Rather, the authority for the bankruptcy court to enter judgment on a legal theory not pled by Exchange Bank is found in Civil Rule 54(c), applicable in adversary proceedings pursuant to Rule 7054, which provides:

> **Demand for Judgment.** A judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment. Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings.

"[Civil Rule 54(c)] has been used to support the conclusion that the legal theories set out in the complaint are not binding on plaintiff." 10 Wright, Miller & Kane, <u>Fed. Practice & Proc.</u> § 2664 (3d ed. 2013).

> If defendant has appeared and begun defending the action, adherence to the particular legal theories of counsel that may have been suggested by the pleadings is subordinated to the court's duty to grant the relief to which the prevailing party is entitled, whether it has been demanded or not.

<u>Id.</u>

The bankruptcy court's authority to award Exchange Bank judgment on a theory it did not assert is not without limits, however.

---

[9](...continued)
and remand the matter to the bankruptcy court to allow Exchange Bank an opportunity to file a Civil Rule 15(b)(2) motion, as counsel for Exchange Bank requested at oral argument.

18

> A court may not, without the consent of all persons affected, enter a judgment which goes beyond the claim asserted in the pleadings. "Unless all parties in interest are in court and have voluntarily litigated some issue not within the pleadings, the court can consider only the issues made by the pleadings, and the judgment may not extend beyond such issues nor beyond the scope of the relief demanded." Sylvan Beach, Inc. v. Koch, 140 F.2d 852, 861 (8th Cir. 1944). The relief must be based on what is alleged in the pleadings and justified by plaintiff's proof, which the opposing party has had an opportunity to challenge. "Rule 54(c) creates no right to relief premised on issues not presented to, and litigated before, the trier." Dopp v. HTP Corp., 947 F.2d 506, 518 (1st Cir. 1991).

Delaney-Morin v. Day (In re Delaney-Morin), 304 B.R. 365, 370-71 (9th Cir. BAP 2003).

Further, "[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." Greenlaw v. United States, 554 U.S. 237, 244 (2008)(quoting Castro v. United States, 540 U.S. 375, 386 (2003)(internal quotation marks omitted).

This is particularly true in the context of dischargeability issues in bankruptcy cases, where the policy of a fresh start for debtors is emphasized. To this end, it is well recognized that exceptions to discharge are to be construed narrowly. See Snoke v. Riso (In re Riso), 978 F.2d 1151, 1154 (9th Cir. 1992).

In determining whether to award relief to Exchange Bank on a theory it did not raise, the bankruptcy court must first have found that doing so would not prejudice the Keiths. The Decision is explicit that the Keiths in fact were prejudiced. Specifically, the bankruptcy court found that the failure of Exchange Bank to

19

recognize its true claim for relief foreclosed any opportunity for the Keiths to settle with Exchange Bank. On that basis, the bankruptcy court denied Exchange Bank its attorney fees. We submit that the prejudice to the Keiths runs deeper than exposure to liability for the attorney fees incurred by Exchange Bank in pursuing a nondischargeable judgment against the Keiths.

The factors required to establish a claim for relief pursuant to § 523(a)(6) differ significantly from those necessary to prove claims for relief pursuant to § 523(a)(2)(A) or (B).[10]

_____

[10]    Section 523(a)(2) provides:

A discharge under section 727...of this title does not discharge an individual debtor from any debt-
...
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by –

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing –
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with the intent to deceive; ....

Section 523(a)(6) provides:

A discharge under section 727...of this title does not
                                              (continued...)

20

The Keiths never were on notice that a § 523(a)(6) claim was being asserted against them; accordingly, they had no opportunity to prepare or present a defense with respect to that claim for relief. The bankruptcy court pointed out as much: "The Keiths, having successfully refuted all the arguments made by [Exchange Bank], cannot be very happy that the court discovered another route [Exchange Bank] did not take." Decision, at 6:9-11.

Moreover, the Ninth Circuit recently reemphasized that a bankruptcy court cannot implicitly extend the time for filing an exception to discharge complaint, the time deadline for which is set forth in Rule 4007(c). See Willms v. Sanderson, 723 F.3d 1094 (9th Cir. 2013). Rule 4007(c) provides:

> . . . [A] complaint to determine the dischargeability of a debt under § 523(c) shall be filed no later than 60 days after the first date set for the meeting of creditors under § 341(a). . . . On motion of a party in interest, after hearing on notice, the court may for cause extend the time fixed under this subdivision. The motion shall be filed before the time has expired.

Section 523(c) applies to exception to discharge claims pursuant to §§ 523(a)(2), (a)(4), and (a)(6). Exchange Bank did not plead a claim for relief pursuant to § 523(a)(6) within the 60-day limitation period. In awarding judgment pursuant to § 523(a)(6), the bankruptcy court implicitly extended the Rule 4007(c) deadline.

In light of the Rule 4007(c) time limitation, had Exchange Bank

[10](...continued)
discharge an individual debtor from any debt–
...
(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

21

filed a Civil Rule 15(b) motion, it would have been required to establish that the § 523(a)(6) claim related back to the original complaint.

> The basic test [for determining whether a claim in an amended complaint relates back to the original complaint] is whether the evidence with respect to the second set of allegations could have been introduced under the original complaint, liberally construed; or as a corollary, that in terms of notice, one may fairly perceive some identification or relationship between what was pleaded in the original and amended complaints.

Gelling v. Dean (In re Dean), 11 B.R. 542, 545 (9th Cir. BAP 1981)(citation omitted). This it could not have done in light of the bankruptcy court's findings. "[Exchange Bank] has made things harder for itself and the court by focusing on the financial statements instead of the [T]ransfer itself." Decision, at 5:4-5.

Finally, the Panel recently issued an unpublished disposition expressing skepticism about the propriety of a bankruptcy court "offering an advisory opinion" on a § 523(a)(6) claim for relief when the creditor had raised only a claim for relief pursuant to 523(a)(2)(B). Antioch Comm. Fed. Credit Union v. Pagnini (In re Pagnini), 2012 WL 5489032 at *1 n.4 (9th Cir. BAP November 13, 2012). Similar to the case now before us, the bankruptcy court found against the creditor on its § 523(a)(2)(B) claim for relief on the basis it had failed to establish the element of damages. We express more than skepticism when, as here, the bankruptcy court did not merely offer an advisory opinion, but awarded judgment pursuant to § 523(a)(6), when the creditor had not raised § 523(a)(6) as a legal theory.

22

## VI.   CONCLUSION

Exchange Bank did not meet its burden of proof to establish that a portion of the debt owed to it by the Keiths was nondischargeable.  The bankruptcy court nevertheless imposed a nondischargeable judgment against the Keiths under a theory not contemplated by Exchange Bank.  Further, it did so without affording the Keiths an opportunity to present a defense.  We REVERSE.

23